IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES | : | |
| | : | |
| v. | : | CRIMINAL ACTION NO.: |
| | : | |
| TANIKA VICTORIA LITTLE, | : | 2:12-CR-539-CDJ-1 |
| | : | |
| Defendant | : | |

## MEMORANDUM

**Judge C. Darnell Jones, II**                                             **July 23, 2014**

Pending before the court is defendant's motion to suppress evidence gathered pursuant to a search warrant executed on June 23, 2011.[1] (Doc. No. 25.) Defendant moves for suppression on several grounds. She argues that the warrant was not supported by probable cause, that it was overbroad, that it was an unconstitutional general warrant, and that officers exceeded its scope. Defendant also argues that the good faith exception does not apply to the search. Finally, defendant moves to suppress statements she made to officers during the search on the grounds that they constitute fruit of the poisonous tree. After a thorough review of the parties' respective briefs, the affidavit in support of the search warrant and the search warrant itself, the parties' proposed findings of fact and conclusions of law, and the transcript of oral argument, the court has determined that the motion to suppress will be **GRANTED IN PART** and **DENIED IN PART**.

## FINDINGS OF FACT

In ruling on the present motion to suppress, the court is limited to reviewing the affidavit of probable cause, which Magistrate Judge M. Faith Angell relied on to issue the

---

[1] Although the Magistrate Judge issued a search warrant for defendant's residence and her vehicle, it appears from the record that her vehicle was never searched. (Doc. No. 27, at 5-7.)

search warrant in question. *U.S. v. Hodge*, 246 F.3d 301, 305 (3d Cir. 2001) ("the Court confines itself to the facts that were before the magistrate judge, i.e., the affidavit, and does not consider information from other portions of the record."). Therefore, this court's findings of fact, as set forth below, will be drawn from the four corners of the affidavit in support of the search warrant:[2]

I, Bryan De Young, being duly sworn, state under oath:

## Introduction

1. I have probable cause to believe that on February 15, 2011[,] and March 1, 2011, Tanika Victoria Little embezzled $110,000 in $20 bills from the armored truck she used as part of her employment to deliver cash to Bank of America, in violation of 18 U.S.C. §§ 656 (bank embezzlement) and 1344 (bank fraud). After taking this money, she has deposited and structured much of this cash in installments into her various bank accounts, in violation of 18 U.S.C. § 1956 (money laundering).

## Affiant's Qualifications

2. I have been a special [a]gent for the United States Secret Service for nine years. Currently, I am assigned to the Financial Crimes Squad in the Philadelphia Field Office, where I focus, among other things, on investigating financial and related crimes, including bank fraud (18 U.S.C. § 1344), embezzlement (18 U.S.C. § 656), and money laundering (18 U.S.C. § 1956). I also have extensive training and experience in conducting financial investigations, and in executing search warrants.

3. I am the case agent in this investigation. This Affidavit is based on, among other things, my training and experience in conducting criminal investigations, my personal knowledge, discussions with witnesses, law enforcement reports, review of documents, public records, and other evidence. I have not included every fact I have learned during the investigation but only sufficient facts to establish probable cause.

## Locations to be Searched

4. I have probable cause to believe that evidence of Little's bank fraud, embezzlement, and money laundering are located in her house located at

---

[2] Portions of the affidavit that are irrelevant for purposes of the present motion to suppress have been redacted.

2041 South Opal Street, Philadelphia, Pennsylvania 19145 and in her car, a Blue Jeep Grand Cherokee, Pennsylvania tag HLT-1071. This house and car are described more particularly in Attachment A. The evidence I believe will be found in her house and car are described more particularly in Attachment B.

### Missing Bank of America Cash: February 15, 2011 and March 1, 2011

5. As of February 2011, Little worked as a messenger at Brink's, Inc., an armored truck service delivering cash to Bank of America branches in the Philadelphia area. Deposits of Bank of America are insured by the Federal Deposit Insurance Corporation. Each Brink's armored truck contains a two-person team – the driver who does not handle money, and the messenger who rides in the back of the truck and physically delivers and picks up cash at each bank branch on the route.

6. On February 15, 2011, a clerical error at Brink's had designated an extra $18,000 bag of $20 bills to be delivered to Bank of America's Drexel Hill branch at 3100 Garrett Road. Little's regular driver-partner was unavailable that morning so a substitute employee drove her route instead. As Little delivered the bags of money to the Drexel Hill branch, M.P., a Bank of America employee, accidentally signed for this extra bag of cash which was listed on Little's manifest. The bank, however, never took possession of this money. Bank of America employees later searched exhaustively for this bag of cash, but could not locate it.

7. Similarly, by March 1, 2011, a clerical error at Brink's had routed an extra $92,000 bag of $20 bills to be delivered to Bank of America's Drexel Hill location. With her regular partner driving her, Little wheeled the bags of cash into the Drexel Hill branch of Bank of America where M.P. again accidentally signed for the bags, including this extra bag of money without having received it. The extra bag was reflected on Little's manifest, but not expected to be delivered by M.P. Again, the bank never actually took possession of this $92,000 bag of cash; Bank of America employees later searched diligently for this money, but could not find it.

### The Subsequent Investigation

8. Brink's investigators launched an investigation into the missing $110,000 in $20 bills and interviewed various witnesses. During the course of this investigation, they spoke to the two Brink's cash room employees who were responsible on the morning of February 15, 2011[,] and March 1, 2011[,] for dispensing cash bags to Little for the day's deliveries.

9. L.S. operated a Brink's cash window on the morning of February 15, 2011. Each morning, armored truck messengers line up – like customers in a

bank – to pick up bags of cash from windows, which they plan to deliver to bank branches throughout the day. L.S. related that Little had often chosen her window in the mornings. L.S. did not remember anything unusual about the morning of February 15, 2011, except that Little began avoiding her after that day.

10. A.B., who operated a window on the morning of March 1, 2011, stated that Little and A.B. have a friendly relationship and that Little would often choose her window in the mornings. During the checkout process this morning, as A.B. handed over three bags of cash (including the extra bag), Little commented that the Drexel Hill location of Bank of America typically only received two bags of cash. When A.B. asked Little if she should double-check, Little replied in substance that, "no, don't worry about it. If there is a mistake, I will bring the extra bag back." A.B. does not remember Little returning any bags at the end of her route that day and, after this morning, Little avoided A.B. as her go-to checkout person.

11. Corporate security for Brink's interviewed Little who denied having taken the money and insisted repeatedly that she had delivered, and M.P. at Bank of America had signed for, the two extra bags of cash. During this interview, Brink's corporate security showed Little video footage of her returning from her route on the afternoon of March 1, 2011, and leaving her armored truck with two large bags and walking away from the truck in violation of company policy. On this footage, Little shortly thereafter returned to the truck empty-handed. When asked about why she left the truck unguarded, Little admitted to leaving the truck with two bags; she maintained that she had to start her car to warm up the engine before leaving work. The temperature on this March day, according to historical records, was well above freezing point. About the bags, Little noted that one of those bags was her purse, and the other one was a Target shopping bag containing a comforter set that she had bought during her scheduled shift. She admitted that she had put both bags into her car.

### Little's Large Cash Deposits

12. My investigation showed that Little is the registered owner of a checking account ending in 3353 and a savings account ending in 3184 at TD Bank. She received statements for both accounts at 2041 S. Opal Street, Philadelphia, PA 19145. The day after Bank of America lost $92,000 in $20 bills, the following large cash deposits – in $20 bills – were made into Little's TD Bank accounts:

| Date | Checking Acct. (3353) | Savings Acct. (3184) |
|---|---|---|
| 3/2/11 | $2,000 | $2,000 |
| 3/3/11 | $1,000 | $1,000 |

| 3/5/11 | $600 | $600 |
|--------|------|------|
| 3/10/11 | $300 | $2,000 |
| 3/11/11 | $2,000 | $2,000 |
| 3/14/11 | $300 (coupled with $751.61 check) | $0 |
| 3/18/11 | $2,000 | $2,000 |
| 3/23/11 | $4,000 | $4,000 |
| **Total so far** | **$12,200** | **$13,600** |

13. I have spoken with a TD Bank investigator who confirmed that the cash deposits were usually made by a black female matching Little's description at a drive-up teller window located at 2201 S. Broad Street, Philadelphia. The car used for the deposits was a blue Jeep Grand Cherokee, PA tag HLT-1071 registered to Little. This is the only car registered to her. Bank surveillance videos show Little making deposits using her jeep. Prior to this day, Little had made no equivalent cash deposits.

[PHOTO REDACTED]

14. Also on March 2, 2011 – the day after $92,000 went missing from Bank of America – Little transferred $10,000 from her savings to her checking account. The following day, she arranged for an electronic payment to a PNC Mortgage account in the amount of $9,999.99.

15. My investigation also revealed that Little opened up a new checking account ending in 6747 at PNC Bank on March 2, 2011 – the day after $92,000 disappeared from Bank of America. Bank statements are being sent to her address at 2041 S. Opal Street, Philadelphia, PA. As with the TD Bank accounts, Little began depositing large sums of cash, all in $20 bills, into this account as follows:

| Date | Checking Acct. (6747) |
|------|----------------------|
| 3/2/11 | $2,020 |
| 3/4/11 | $2,000 |
| 3/7/11 | $700 |
| 3/11/11 | $2,000 |
| 3/14/11 | $300 |
| 3/23/11 | $4,000 |
| 6/1/11 | $1,600 |
| **Total so far** | **$12,620** |

Based on my training and experience, I know that individuals who embezzle cash often deposit cash into their banks, sometimes using

multiple bank accounts, in increments like the ones employed by Little, to avoid raising suspicion.

16. I have confirmed from video footage from the bank that, for example, the June 1, 2011[,] $1,600 cash deposit into this bank account ending in 6747 was made by Little:

[PHOTO REDACTED]

17. From this bank account ending in 6747, Little has paid personal expenses, including merchandise from home improvement and furniture stores, clothing shops, and electronics outlets. I have also observed the exterior of Little's home in June 2011. It appears that her home has undergone significant renovations. The front exterior appears to be new and stands out when compared to other nearby homes. A photo of this house in comparison with neighboring homes is included in Attachment A.

18. Since March 2, 2011, Little has deposited about $38,420 in $20 bills into her various bank accounts. This is about the equivalent of her entire annual salary at Brink's. Her structured deposits leave about $71,580 in $20 bills unaccounted for.

19. Based on my knowledge, training, and experience, and that of other participating law enforcement officers, I know that many individuals involved in embezzlement and money laundering keep evidence of their crimes at home or in their cars. This evidence includes cash, check registers, receipts, bank documents or other documents from financial institutions, and other evidence of cash expenditures.

20. Based on the foregoing, probable cause exists to believe that Little has committed bank fraud[,] embezzlement, and money laundering[] and that her house at 2041 South Opal Street[] Philadelphia, Pennsylvania 19145 and her Blue Jeep Grand Cherokee, Pennsylvania tag HLT-1071, both registered to Little, contain evidence of the crimes under investigation here.

(Doc. No. 25, Exh. A, at 6-13.)

On June 21, 2011, Judge M. Faith Angell issued a search warrant on the basis of Agent De Young's affidavit, identifying the location to be searched as Ms. Little's residence at 2041 S. Opal Street Philadelphia, Pennsylvania 19145 and her car, Pennsylvania tag HTL-1071. The warrant listed the following items to be seized:

1.  Any $20 bills.

2.  Any U.S. [c]urrency straps which are typically thin pieces of colored paper used to bundle bills.

3.  Any clear plastic bags, manifests, and documents marked with the "Brink's" label.

4.  Any papers and effects related to the theft, use, and disposition of stolen U.S. currency including receipts, bank statements, Target bags, comforter sets, brokerage statements, mortgage statements, credit card statements, in paper and electronic form.

5.  Merchandise acquired after February 15, 2011[,] and reasonably traceable to the embezzlement of $110,000.

(Doc. No. 25, Exh. A, at 20.)

## CONCLUSIONS OF LAW

1.) In reviewing a magistrate judge's finding of probable cause to issue a search warrant, the court is limited to considering the information within the four corners of the affidavit in support of probable cause. *U.S. v. Beatty*, 437 F.App'x 185, 187 (3d Cir. 2011). This court's job is to determine whether Magistrate Judge Angell had a "substantial basis to conclude that the affidavit supporting the warrant established probable cause." *Id.* (quotation omitted). "[T]he resolution of doubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants." *U.S. v. Jones*, 994 F.2d 1051, 1055 (3d Cir. 1993) (quotation omitted). "A grudging or negative attitude by reviewing courts towards warrants is inconsistent with the Fourth Amendment's strong preference for searches conducted pursuant to a warrant." *U.S. v. Hodge*, 246 F.3d 301, 307 (3d Cir. 2001) (quotation omitted).

2.) The totality-of-the-circumstances test is used to determine whether there is probable cause for the issuance of a search warrant. *Illinois v. Gates*, 462 U.S. 213, 230-31 (1983). "In dealing with probable cause, as the name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonably and prudent men, not legal technicians, act." *Id.* (quotation omitted).

3.) There must be a "nexus between the suspected criminal activity and the place to be searched." *U.S. v. Savage*, 07-CR-550-06, 2012 WL 5881851, *9 (E.D.Pa. Nov. 20, 2012) (citing *U.S. v. Hodge*, 246 F.3d 301, 305 (3d Cir. 2001)). "[D]irect evidence linking the place to be searched to the crime is not required for the issuance of a search warrant. Instead, probable cause can be,

7

and often is, inferred by considering the type of crime, the nature of the items sought, the suspect's opportunity for concealment and normal inferences about where a criminal might hide stolen property." *U.S. v. Conley*, 4 F.3d 1200, 1207 (3d Cir. 1993) (quotations omitted).

4.) Evidence indicating that a suspect committed a crime is itself information that supports a nexus between the crime and the suspect's property. *U.S. v. Hodge*, 246 F.3d 301, 307 (3d Cir. 2001) ("Moreover, as Hodge concedes, probable cause existed to arrest him on drug-related charges . . . again making it more likely that drug-related evidence would be stored at his home.")

## The Warrant Was Supported by Probable Cause

5.) The affidavit in support of probable cause presents substantial evidence that defendant was responsible for the crime for which Judge Angell issued the search warrant. First, the affidavit states that defendant was solely responsible for physically delivering and picking up cash at each bank branch. (Doc. No. 25, Exh. A, at 7.) On February 15, 2011, $18,000 was mistakenly routed to Bank of America's Drexel Hill branch. (Id.) On March 1, 2011, a similar mistake led to the improper routing of an additional $92,000. (Id. at 8.) Both bags of money disappeared at some point after they were consigned to defendant. (Id.) Video footage on March 1 showed defendant leaving her armored truck in violation of company policy with two bags and returning empty-handed. (Id. at 9.) The day after the second routing mistake, defendant began depositing large sums of cash into her checking and savings account, as well as in a new checking account that she opened on March 2. (Id. at 10-11.) In the course of March 2011, she deposited a total of $12,200 in her old checking account and $13,600 in her old savings account. (Id. at 6.) As for her new checking account, she deposited $11,020 in the span of a month. (Id. at 7.) In total, defendant deposited approximately $38,420 in $20 bills into her various accounts in a span of four months, an amount which is the equivalent of her annual salary. (Id. at 12.) These large deposits, coupled with the absence of similar deposits before the date the money went missing, suggests that Ms. Little was responsible for its disappearance. Furthermore, Ms. Little's deposits were all in cash, particularly in $20 bills, and were deposited in small increments, which permits the inference that defendant was attempting to avoid raising suspicion. (Id. at 6-7.)

6.) Furthermore, the statements in Agent De Young's affidavit support a nexus between the crimes charged and the place to be searched, here Ms. Little's residence. In particular, the affidavit shows that, of the $110,000 that defendant is alleged to have stolen, only $38,420 has been deposited, leaving $71,580 unaccounted for. This information, along with Agent De Young's opinion based on "knowledge, training, and experience . . . that many

8

individuals involved in embezzlement and money laundering keep evidence of their crimes at home or in their cars, permits the reasonable inference that defendant was storing the remainder of the proceeds of the alleged crime at her residence. Moreover, the affidavit states that defendant has purchased merchandise from home improvement stores, furniture stores, and electronics outlets after the date that the money went missing, which supports the conclusion that evidence of the alleged crime would be found at Ms. Little's residence.

7.) However, Agent De Young's statement that Ms. Little's house had recently undergone significant renovations fails to further support a nexus between the alleged crime and her residence. First, it appears as though Agent De Young statement is unsupported by any corroborating information that the renovations were recent. Furthermore, the government does not argue that Mr. De Young has any expertise in determining the age of home improvements. As such, his statement that the home had undergone recent renovations appears to be mere speculation and is not credible.

8.) While temporal remoteness between the commission of a crime and the execution of a search warrant may, under the totality-of-circumstances test, weigh against finding a nexus between the crime committed and the place to be searched, in this case four months[3] is insufficient to destroy probable cause. This conclusion is supported by Agent De Young's statements concerning the amount of money Ms. Little had deposited in her accounts, and more importantly, the remaining balance, which was unaccounted for at the time. There was certainly a substantial basis for Magistrate Judge Angell to conclude that the remaining money could be found at Ms. Little's residence, notwithstanding the passage of four months.

9.) Looking at the information provided in the affidavit as a whole, Magistrate Judge Angell had a substantial basis to conclude that the affidavit supporting the warrant established probable cause that there would be evidence of the alleged crime at defendant's residence.

### The Warrant Was Not Overbroad

10.) "An overly broad warrant describes in both specific and inclusive generic terms what is to be seized, but it authorizes the seizure of items as to which there is not probable cause." *U.S. v. Ninety-Two Thousand Four Hundred Twenty-Two Dollars and Fifty-Seven Cents*, 307 F.3d 137, 149 (3d Cir. 2002) (quotations omitted).

---

[3] Defendant is alleged to have embezzled the money on February 15, 2011, and March 1, 2011. The search took place on June 23, 2011. (Tr. at 4.)

11.) "The Fourth Amendment dictates that a magistrate [judge] may not issue a warrant authorizing a search and seizure which exceeds the ambit of probable cause showing made to him. An otherwise unobjectionable description of the objects to be seized is defective if it is broader than can be justified by the probable cause upon which the warrant is based." *U.S. v. Christine*, 687 F.2d 749, 753 (3d Cir. 1982) (quotations omitted).

12.) Defendant claims that the phrase "[m]erchandise acquired after February 15, 2011[,] and reasonably traceable to the embezzlement of $110,000" renders the search warrant overly broad.

13.) In this case, every purchase defendant made after February 15, 2011, had evidentiary value because a large dollar amount of purchases vis-à-vis her income could create an inference that she had embezzled and was spending the missing Brink's money. To the extent defendant argues that the warrant should have limited the search to large purchases, such a limitation would have rendered the warrant underinclusive. As agent De Young stated in the affidavit, embezzlers often execute transactions in small denominations to avoid detection. It is certainly conceivable that defendant engaged in similar conduct in her purchase decisions. Furthermore, it would have been unreasonable for Magistrate Judge Angell to have determined an applicable dollar limit that would have accurately distinguished between the expenditure of the allegedly embezzled funds and the expenditure of legal funds. Therefore, the warrant was not overbroad.

14.) Regardless of whether the warrant was overbroad, it does not appear that any evidence was seized pursuant to the portion of the "Evidence to be Seized" section to which defendant objects. Defendant lists the following items as seized during the search:

> (1) a number of store receipts for purchases made between November, 2010[,] and June, 2012; (2) a Lowe's Preferred Customer Credit Card in Ms. Little's name; (3) two United States Passport application documents; (4) two receipts for domestic money orders in the amounts of $110.00 and $80.00, as well as passport fees, two Postal money order receipts; (5) one photocopy of the birth certificate of Ms. Little's daughter [NAL]; (6) Ms. Little's TD Bank debit card; (7) a Mastercard in Ms. Little's name; (8) a receipt for services from Comcast in the amount of $131.00; (9) a service receipt for a home security system in the amount of $121.00; (10) a receipt for collision work on Ms. Little's Jeep Grand Cherokee; (11) four Dave and Buster Power Cards; (12) a receipt for an April 23, 2011 purchase from the Furniture Connection Outlet; (13) a Maaco collision repair estimate receipt in the amount of $1,500.00;

10

(14) a Mandee Credit Card in Ms. Little's name; (15) a TD Bank gift card; (16) a Bally's Total Rewards Card for the casino in Ms. Little's name; (17) a receipt for Bare Feet Shoes for a purchase in the amount of $19.99; (18) a receipt for a January 1, 2011[,] purchase from Wet Seal in the amount of $31.70; (19) a receipt from J.M. Iron Works for the installation of iron railings in the amount of $1,300; and (20) approximately $700.00 in cash.

(Doc. No. 25, at 7-8.)

15.) The proper remedy for an overbroad warrant is suppression of the evidence seized pursuant to the invalid portions of the warrant, not an invalidation of the search as a whole. *U.S. v. Christine*, 687 F.2d 749, 758 (3d Cir. 1982). It appears that no items were seized pursuant to the phrase, "[merchandise] acquired after February 15, 2011[,] and reasonably traceable to the embezzlement of $110,000." Therefore, even if defendant was correct that warrant was overly broad, her argument would be moot.

**The Warrant Was Not an Unconstitutional General Warrant**

16.) A general warrant is one "that authorizes 'a general exploratory rummaging in a person's belongings.'" *U.S. v. Christine*, 687 F.2d 749, 752 (3d Cir. 1982) (quoting *Coolidge v. New Hampshire*, 403 U.S. 443 (1971)). The particularity requirement of the Fourth Amendment prohibits warrants that grant police officers discretion in determining what items are seizable during a search. *Andresen v. Maryland*, 427 U.S. 463, 480 (1976) ("As to what is to be taken, nothing is left to the discretion of the officer executing the warrant.").

17.) The purpose of the particularity requirement is twofold: "one, to limit the agents' discretion as to what they are entitled to seize; and two, to inform the subject of the search what can be seized." *Bartholomew v. Pennsylvania*, 221 F.3d 425, 428-29 (3d Cir. 2000) (citing *United States v. McGrew*, 122 F.3d 847, 849 (9th Cir. 1997)).

18.) "[W]arrants . . . for the following materials have been struck down as general warrants: (1) evidence of smuggled goods; (2) evidence of obscene materials; (3) evidence of books, records, pamphlets, cards, lists, memoranda, pictures, recordings, and other written instruments concerning the Communist Party of Texas; (4) evidence of illegally obtained films; and (5) evidence of stolen property." *U.S. v. Yusuf*, 461 F.3d 374, 393 (3d Cir. 2006) (internal quotations and citations omitted).

19.) Defendant argues that the warrant in this case was a general warrant because section five of the "Evidence To Be Seized" portion of the warrant

states, "Merchandise acquired after February 15, 2011[,] and *reasonably traceable* to the embezzlement of $110,000." (Doc. No. 25, Exh. A, at 16 (emphasis added)). To the extent section five can be read as broad and discretionary, its language is tempered by the rest of the warrant, which details with specificity the items to be seized. *See Andresen v. Maryland*, 427 U.S. 463, 480-82 (1976) (reading sentence itemizing objects to be seized as a whole instead of in discrete segments in determining whether warrant was impermissible general warrant); *see also U.S. v. Pindell*, 336 F.3d 1049, 1053 (D.C. Cir. 2003) (refusing to look at items to be seized in isolation when phrase in question appeared at end of list of items to be seized)[4]. The warrant states in toto:

1. Any $20 bills.

2. Any U.S. [c]urrency straps which are typically thin pieces of colored paper used to bundle bills.

3. Any clear plastic bags, manifests, and documents marked with the "Brink's" label.

4. Any papers and effects related to the theft, use, and disposition of stolen U.S. currency including receipts, bank statements, Target bags, comforter sets, brokerage statements, mortgage statements, credit card statements, in paper and electronic form.

5. Merchandise acquired after February 15, 2011[,] and reasonably traceable to the embezzlement of $110,000.

---

[4] The court said:

Pindell argues that that the phrase "any other evidence of a violation of Title 18 U.S.C. § 242" is simply too broad to be regarded as "particularly describing the things to be seized." U.S. CONST. amend. IV.

We have no doubt that had the warrants *merely* authorized the seizure of "evidence of a violation of Title 18 U.S.C. § 242," they would indeed have been impermissibly broad. But that phrase did not stand alone, and instead came in the same sentence as, and at the conclusion of, a quite specific list of items to be seized. That list constrained the interpretation of the last phrase, making it reasonably clear that the warrants did not authorize the seizure of evidence of just any violation of § 242, but rather of evidence relating to such a violation in connection with Osman Dainkeh.

*U.S. v. Pindell*, 336 F.3d 1049, 1053 (D.C. Cir. 2003).

20.) Here, investigators had significant circumstantial evidence that linked defendant with the missing Brink's money, but, without first looking at Ms. Little's receipts, it was unlikely that they could determine what receipts were directly traceable to the alleged crime. Therefore, the search warrant was as specific as reasonably possible under the circumstances and described with sufficient particularity the items to be seized. *Lesoine v. County of Lackawanna*, 77 F.App'x 74, 78-79 (3d Cir. 2003) (requiring *reasonable* particularity in describing items to be seized); *see also U.S. v. One 1977 Lincoln Mark V Coupe*, 643 F.3d 154, 157 (3d Cir. 1981) (quoting *Brinegar v. U.S.*, 338 U.S. 160, 175 (1949) ("In dealing with probable cause, however, as the name implies, we deal with probabilities. These are not technical; they are factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.").

### The Agents Exceeded the Scope of the Warrant

21.) "If the scope of [a] search exceeds that permitted by the terms of a validly issued warrant or the character of the relevant exception from the warrant requirement, the subsequent seizure is unconstitutional without more." *Horton v. California*, 496 U.S. 128, 140 (1990).

22.) The warrant in this case cannot be read as reasonably authorizing the seizure of receipts for items purchased before February 15, 2011, or defendant's daughter's birth certificate. Moreover, the United States concedes that these items should not have been taken. As such, they shall be suppressed.

23.) As for defendant's debit and credit cards and her Dave and Buster's Power Cards, the warrant allowed a search for "credit card statements, in paper and electronic form," (Doc. No. 25, Exh. A, at 7), but not the cards themselves. As such, these cards shall also be suppressed.

24.) Despite these defects in the search, "suppression of *all* evidence seized is not justified unless those executing the warrant acted in flagrant disregard of the warrant's terms." *U.S. v. Matias*, 836 F.2d 744, 747 (2d Cir. 1988) (quotations and citations omitted); *see also U.S. v. Christine*, 687 F.2d 749, 757 (3d Cir. 1982) ("The entire search would only seem to be invalid if its general tenor was that of an exploratory search for evidence not specifically related to the search warrant.").

25.) This case does not present a situation where officers flagrantly disregarded the warrant's terms or engaged in a general exploratory search for evidence not related to the warrant. Moreover, defendant does not allege that officers searched in a location that was not authorized by the warrant, only that they

seized items not listed in the warrant. Therefore, those items that were improperly seized will be suppressed, but the search as a whole will not be invalidated.

### The Good Faith Exception Applies In Part

26.) "The good faith exception instructs that suppression of evidence is inappropriate when an officer executes a search in objectively reasonable reliance on a warrant's authority." *U.S. v. Hodge*, 246 F.3d 301, 307 (3d Cir. 2001) (quotation omitted). "The test for whether the good faith exception applies is 'whether a reasonably well trained officer would have known that the search was illegal despite the magistrate judge's authorization.'" *U.S. v. Loy*, 191 F.3d 360, 367 (3d Cir. 1999) (quoting *U.S. v. Leon*, 468 U.S. 897, 926 (1984)).

27.) "The mere existence of a warrant typically suffices to prove that an officer conducted a search warrant in good faith and justifies the application of the good faith exception." 246 F.3d at 307-08.

28.) Here, Magistrate Judge Angell issued a warrant, so the good faith exception applies to this search at the outset.

29.) The good faith exception does not apply, however, when:

> (1) the magistrate [judge] issued the warrant in reliance on a deliberately or recklessly false affidavit (citing *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978));
>
> (2) the magistrate [judge] abandoned his judicial role and failed to perform his neutral and detached function (citing *Lo Ji Sales, Inc. v. New York*, 442 U.S. 319, 99 S.Ct. 2319, 60 L.Ed.2d 920 (1979));
>
> (3) the warrant was based on an affidavit 'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable' (quoting *Brown v. Illinois*, 422 U.S. 590, 610-11, 95 S.Ct. 2254, 2265, 45 L.Ed.2d 416 (1975) (Powell, J., concurring)); or
>
> (4) the warrant was so facially deficient that it failed to particularize the place to be searched or the things to be

seized (citing *Massachusetts v. Sheppard*, 468 U.S. 981, 104 S.Ct. 3424, 82 L.Ed.2d 737 (1984)).

*U.S. v. American Investors of Pittsburgh, Inc.*, 879 F.2d 1087, 1106-07 (3d Cir. 1989) (quoting *U.S. v. Medlin*, 798 F.2d 407, 409 (10th Cir. 1986)).

30.) In this case, defendant argues that the third and fourth exceptions to the good faith rule apply. (Doc. No. 25, at 19.) However, the affidavit was not so lacking in indicia of probable cause as to make the warrant entirely unreasonable, as explained above. Moreover, the phrase, "[m]erchandise acquired after February 15, 2011 and reasonably traceable to the embezzlement of $110,000" was not so facially deficient in failing to particularize the items to be searched that the searching officers could not rely in good faith on the warrant.

31.) Nonetheless, the good faith exception does not apply to the seizure of Ms. Little's daughter's birth certificate, the receipts dated before February 15, 2011, and Ms. Little's credit cards, debit cards, and Dave and Buster's cards because the warrant clearly did not authorize seizure of those items. Moreover, as noted above, the United States has conceded that the birth certificate and the receipts dated before February 15 were improperly seized.

### Defendant's Statement Was Not Fruit of the Poisonous Tree

32.) "Evidence acquired during an unlawful search or seizure, as well as evidence obtained as a direct or indirect product of such an incursion, must be suppressed at trial." *U.S. v. Rivera*, 441 F.App'x 87, 89 (3d Cir. 2011) (citing *Wong Sun v. U.S.*, 371 U.S. 471, 484-85 (1963)). This proscription applies to statements taken from the accused that stem from and have become tainted by an unlawful search. *U.S. v. DeSumma*, 272 F.3d 176, 179 (3d Cir. 2001) (citing 371 U.S. at 488.).

33.) Because the court has determined that the search in this case was conducted pursuant to a warrant supported by probable cause, defendant's statement did not stem from an unlawful search. Therefore, it will not be suppressed.

BY THE COURT:

C. DARNELL JONES, II  J.

15